IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 13-cv-01643-PAB-CBS

J. BRUCE NORMAN and
DIANE NORMAN,

      Plaintiffs,

v.

STATE FARM FIRE AND CASUALTY COMPANY,

      Defendant.

---

## ORDER

---

      This matter is before the Court on the Motion for Partial Summary Judgment

[Docket No. 33] filed by defendant State Farm Fire and Casualty Company ("State

Farm").  The Court has subject matter jurisdiction pursuant to 18 U.S.C. § 1332.

## I.  BACKGROUND[1]

      This case arises out of an insurance coverage dispute over residential property

damage caused by the Waldo Canyon Fire in Colorado in June and July 2012.

Plaintiffs J. Bruce and Diane Norman's Colorado Springs, Colorado home was insured

under a homeowners policy, policy number 86-48-2982-4 (the "policy"), issued by State

Farm.  Docket No. 31-6 at 2.  On June 23, 2012, the Normans were directed by law

enforcement to evacuate their home due to the proximity of the fire.  Docket No. 33 at

3, ¶ 1; Docket No. 33-1 at 4, p. 140:7-11.  On June 29, 2012, State Farm contacted the

---

[1]The following facts are undisputed unless otherwise indicated.

Normans.  Docket No. 33 at 3, ¶ 2.  Mrs. Norman told the State Farm representative that she believed her home was intact, but that the home would likely have smoke damage.  Docket No. 33-3 at 20-21.[2]  On July 5, 2012, the Normans returned to their home and reported heavy smoke damage to the interior and exterior of the home with some melting.  *Id.* at 20.  The following day, State Farm contacted the Normans and scheduled an inspection of the property.  *Id.*  On July 10, 2012, State Farm inspected the Normans' home.  *Id.*  The claim notes state:

> there is a slight smoke smell in the house, found light smoke damage throughout the home . . . , no fire damage to home found, sprinklers, waterfall damaged.  [E]lectrical box and sprinkler system burned. . . . they are in the process of obtaining estimates to replace the landscaping, repair the sprinkler[] system and rocks and waterfall.
>
> I inspected the entire home while in white socks for 1 ½ to 2 hrs, after inspection found slight soot on socks.

*Id.* at 19-20.  On July 11 and 13, 2012, Mrs. Norman requested an advance to begin cleaning, at which point State Farm explained that the entire claim would be completed in a few days.  *Id.* at 19.  On July 17, State Farm issued the Normans a check for $78,106.36, along with documents explaining the basis for the payment.  Docket No. 33 at 4, ¶ 7.  The following day State Farm issued the Normans a second check for $8,556.78 to correct an error made in calculating the policy benefits.  *Id.* at 4, ¶ 8.  Edwin Lucero, State Farm's Rule 30(b)(6) deponent, stated that, had State Farm not received additional information, the payments made in July 2012 would have been the settlement of the Normans' claim.  Docket No. 36-3 at 10-11, pp. 85:21-86:7.  The

---

[2]Neither party disputes the admissibility of the statements contained within claim notes kept by State Farm.

Normans have continued to live in their home since approximately July 5, 2012.  Docket No. 33-1 at 4, p.140:3-19.

On July 30, 2012, State Farm received an estimate from Rocky Mountain Electric for the replacement or repair of exterior outlets, flood lights, and a light post.  Docket No. 33-3 at 17.  Although the exterior lights were working, Mrs. Norman indicated that the lights had baked on soot damage.  *Id.*  The claim notes state that State Farm "spoke with ctr Jason with Rocky Mountain Electric.  We discussed the condition of the lights.  He said that while there may be some baked soot on . . . some of the fixtures, he would not definitively say that the fixtures needed to be replaced." *Id.*  A State Farm representative inspected and took photographs of the damaged lights.  *Id.*  On August 4, 2012, State Farm revised the damage estimate of the Normans' claim to include cleaning of exterior light fixtures and replacement of a light post.  *Id.* at 16-17.  On August 7, 2012, State Farm discussed the revised estimate with Mrs. Norman and mailed the Normans a check for $784.83.  Docket No. 33 at 5, ¶ 12.[3]

On August 23, 2012, Mrs. Norman informed State Farm that "she keeps having the carpets cleaned and the water is black so it appears there is still smoke deep in the carpet.  She has carpet company (her son) coming back out this next week and will advise if it is better or not."  Docket No. 33-3 at 16.  The claim notes state that, on August 29, 2012, Mrs. Norman contacted State Farm and expressed her concern that carpet cleaning time and costs had exceeded what had been estimated, noting that the carpet had been cleaned several times.  *Id.* at 15-16.  State Farm asked Mrs. Norman

---

[3]The two payments in July 2012 and the August 2012 payment are collectively referred to herein as the "July/August 2012" payment.

to submit an itemized bill. *Id.* The record does not indicate whether, prior to submitting a proof of loss in February 2013, Mrs. Norman provided any further documentation to State Farm concerning carpet cleaning expenses.

On September 28, 2012, Mrs. Norman contacted State Farm and stated that, due to electrical issues, an electrician was coming to the home. Docket No. 33 at 5, ¶ 16. Ms. Norman also indicated that she was experiencing issues with the home's windows:

> [Ms. Norman] has called Anderson Windows and they cannot see any issues with the seals of the windows. They have told her that the warranties on the windows will be void once they are exposed to 160 degrees (heat). I explained that if the windows are not showing any damage, then there really isn't anything to review. Also, if damage does show, she can let us know and we can investigate further. However, we would not owe her for her warranty.

Docket No. 33-3 at 15. On October 15, State Farm contacted Mrs. Norman, who stated that she was waiting for estimates on electrical work and windows. *Id.* The record does not indicate whether, prior to submitting a proof of loss in February 2013, the Normans provided State Farm with additional estimates regarding electrical work and windows.

In October 2012, the Normans retained public adjuster Troy Payne of Loss Analytics (the "public adjuster"). Mr. Payne was retained at a rate of ten percent of any payment he assisted in recovering. Docket No. 36 at 9, ¶ 22. On October 16, 2012, State Farm received a letter from Loss Analytics stating that it had been retained by the Normans. Docket No. 33 at 6, ¶ 18. That same day, State Farm left a voicemail for Mr. Payne. Docket No. 33-3 at 15. On November 27, 2012, State Farm sent Loss Analytics and the Normans letters "to determine if there is anything pending on this claim." *Id.* at 14-15.

4

In November 2012, the public adjuster retained industrial hygienist SJR Environmental Consulting ("SJR"), who inspected and tested the Normans' home to "characteri[z]e the impact of soot, char and ash on the interior surfaces and contents of the structure, as well as to assess the potential occupant exposures to soot, ash, char, smoke and other common contaminants . . . ." Docket No. 36-7 at 5. SJR issued a report that found ash and char present throughout the house and soot residue present inside the furnace and air ducts. *Id.* at 4. The report noted that, "[a]lthough the analytical results indicate that compounds of concern were below health-based guidelines for short term occupancy, . . . cleaning is recommended to prevent chronic exposure." *Id.* at 4. SJR also recommended ventilating the interior of the home, removing attic insulation and cleaning structural components, decontamination of walls, ceiling, and floors throughout the home, cleaning of the HVAC system, cleaning, decontamination, or disposal of personal items, and further testing. *Id.* at 11-12. On December 17, 2012, State Farm received SJR's report and invoice. Docket No. 36 at 9, ¶ 24; *see also* Docket No. 36-14 at 1. State Farm did not pay SJR's invoice as requested by SJR and the Normans. Docket No. 36 at 9, ¶ 24.

On December 17, 2012, State Farm contacted Mrs. Norman, who said that she would be meeting with the public adjuster in the near future to review the scope of repairs the Normans wished to pursue. Docket No. 33-3 at 14. State Farm left the Normans' claim open and asked Mrs. Norman to "submit any pending concerns for review." *Id.* On December 26, 2012, State Farm left a message for Mr. Payne, who was on vacation at the time, inquiring as to the scope of any claimed repairs. *Id.* On

January 8, 2013, Mr. Payne emailed State Farm, indicating that the proof of loss would be submitted shortly.  Docket No. 33 at 6, ¶ 22.

On February 20, 2013, Loss Analytics provided State Farm with a proof of loss estimate of $809,949.23 (the "proof of loss").  Docket No. 33-4 at 3.  The proof of loss estimate did not contain an itemized list of those parts of the Normans' home and property that required repair, replacement, or cleaning.  *See generally id.*  On February 22, 2013, State Farm and Mr. Payne discussed the proof of loss and agreed that State Farm may need to conduct an additional inspection.  Docket No. 33-3 at 12.  On March 5, 2013, State Farm received from Mr. Payne hundreds of photos of the Normans' home.  Docket No. 36 at 10, ¶ 27.  The claim notes state that State Farm contacted Mr. Payne and "asked that he submit a scope of repairs as that has not yet been received." Docket No. 33-3 at 11.  On March 11, 2013, State Farm emailed Mr. Payne requesting that he submit a scope of repairs.  Docket No. 33 at 7, ¶ 28.  On March 19, 2013, State Farm left a voicemail for Mr. Payne and sent an email requesting that Mr. Payne provide a building damage repair estimate.  Docket No. 33 at 7, ¶ 29; Docket No. 33-3 at 10.  On March 22, 2013, State Farm received from Loss Analytics a disc that included the complete itemized estimate of damages.  Docket No. 36 at 10, ¶ 28; Docket No. 38 at 5, ¶ 28; *see generally* Docket No. 36-8.  The parties dispute whether this estimate reflected "whole-house damages."  Docket No. 36 at 10, ¶ 28; Docket No. 38 at 5, ¶ 28.

On March 27, 2013, State Farm informed Mr. Payne that State Farm was retaining its own engineer and industrial hygienist to inspect the Normans' home. Docket No. 33 at 7, ¶ 31.  On April 11, 2013, Engineering Systems Inc. ("ESI"), an

6

engineering firm hired by State Farm, and Forensic Analytical Consulting Services ("FACS"), an industrial hygienist firm hired by State Farm, conducted an inspection of the Normans' home.  Docket No. 33 at 8, ¶ 33.  The inspection examined the roof, stucco, windows, exterior doors, landscaping, exterior electrical fixtures, HVAC system, sound system, appliances, cabinets, countertops, and garage door openers.  Docket No. 36 at 10, ¶ 29.  The claim notes state that the Normans complained that their dryer, Tempurpedic bed and treadmill worked only sometimes, but that those items were working on the day of the inspection.  Docket No. 33-3 at 8.  State Farm explained that it would await test results and reports before determining whether to take further action. *Id.*  On April 26, 2013, ESI issued its report.  Docket No. 36-1 at 2.  ESI's report concluded that the roof, stucco, deck, windows, doors, and interior cabinets did not appear to have suffered damage from the fire.  Docket No. 36-1 at 10.  The staircase handrail was split, possibly due to excessive heat in the residence during the fire.  *Id.* Trees showed fire damage, but the driveway and outdoor walkways appeared undamaged due to heat or fire.  *Id.*  On May 1, 2013, FACS issued its report.  Docket No. 36-2 at 1.  FACS' report recommended cleaning/restoration of areas with visible smoke impact and cleaning of surfaces with "'uncommon' prevalence of combustion products," which included furnishings/contents/fixtures, flooring/baseboards/door thresholds, windows, the attic, and the exterior.  Docket No. 36-2 at 7.[4]

On May 9, 2013, State Farm reviewed the ESI and FACS reports.  Docket No.

---

[4]An "uncommon" percentage of combustion product is defined as > 10% and is indicative "of an unusual percentage of the dust composition (but may or may not contribute to corrosion potential or environmental health risk) and likely due to a large source of combustion particles (e.g. wildfire)."  Docket No. 36-2 at 6.

33 at 8, ¶ 35.  On May 16, 2013, State Farm contacted Mr. Payne requesting information regarding completed repairs at the Normans' home.  Docket No. 33-3 at 6-7.  On May 21, 2013, State Farm met with the Normans and Mr. Payne to discuss the Normans' claim.  Docket No. 33-3 at 5-6.  On May 29, 2013, State Farm contacted Mrs. Norman and confirmed that it was completing its estimate of repairs for known items, but would keep the claim open for any unknown items.  *Id.* at 4.  State Farm also requested copies of receipts referred to in the proof of loss.  *Id.*  On May 31, 2013, State Farm informed the Normans that it declined to accept the entire proof of loss, but sent the Normans $85,574.43 (the "May 2013 payment") as compensation for "covered damages as outlined in the enclosed building estimate and contents inventory."  Docket No. 33-7 at 1, 3-9.[5]

On June 21, 2013, the Normans filed the present case.  Docket No. 1.  The Normans' first claim for relief alleges that State Farm breached the implied covenant of good faith and fair dealing.  Docket No. 5 at 4.  The Normans' second claim for relief alleges that State Farm breached the policy.  *Id.* at 4-5.  The Normans' third claim for relief alleges that State Farm violated Colo. Rev. Stat. § 10-3-1115 and § 10-3-1116.  *Id.* at 5.  On August 26, 2013, plaintiff disclosed a damage estimate from David Poynor, who estimated the Normans' total damages at $514,878.71.  Docket No. 33-8 at 1, 3.  On December 30, 2013, the Normans disclosed a report from Mr. Poynor, which included Mr. Poynor's itemized calculation of the Normans' damages.  *See generally*

---

[5]The building estimate and contents inventory itemized the payment, including those amounts paid for repair/replacement of appliances, doors, carpet, and landscaping, along with cleaning and electrical expenses.  *Id.*

Docket No. 36-10.[6]  In a separate order, the Court determined that Mr. Poynor's opinions are inadmissible pursuant to Fed. R. Civ. P. 702.  Docket No. 63.

In the present motion, State Farm seeks summary judgment on the Normans' claims for breach of the implied covenant of good faith and fair dealing and violation of Colo. Rev. Stat. § 10-3-1115 and § 10-3-1116.  Docket No. 33 at 1.  The motion is fully briefed and both parties have submitted supplemental authority.  Docket Nos. 43, 48.

## II.  STANDARD OF REVIEW

Summary judgment is warranted under Federal Rule of Civil Procedure 56 when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248-50 (1986).  A disputed fact is "material" if under the relevant substantive law it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc*., 259 F.3d 1226, 1231-32 (10th Cir. 2001).  Only disputes over material facts can create a genuine issue for trial and preclude summary judgment*. Faustin v. City & Cnty. of Denver*, 423 F.3d 1192, 1198 (10th Cir. 2005).  An issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party.  *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

However, "[w]hen, as in this case, the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy its burden at the summary judgment stage by identifying a lack of evidence for the nonmovant on an essential element of the

---

[6]State Farm's challenge to the admissibility of Mr. Poynor's opinions will be addressed in a separate order.

nonmovant's claim." *Bausman v. Interstate Brands Corp.,* 252 F.3d 1111, 1115 (10th Cir. 2001) (quoting *Adler v. Wal-Mart Stores, Inc.,* 144 F.3d 664, 671 (10th Cir. 1998)) (internal quotation marks omitted).  "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Concrete Works of Colo., Inc. v. City & Cnty. of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986)).  The nonmoving party may not rest solely on the allegations in the pleadings, but instead must designate "specific facts showing that there is a genuine issue for trial."  *Celotex,* 477 U.S. at 324; *see* Fed. R. Civ. P. 56(e).  "To avoid summary judgment, the nonmovant must establish, at a minimum, an inference of the presence of each element essential to the case."  *Bausman,* 252 F.3d at 1115 (citing *Hulsey v. Kmart, Inc.,* 43 F.3d 555, 557 (10th Cir.1994)).  "In applying this standard, we view all facts and any reasonable inferences that might be drawn from them in the light most favorable to the nonmoving party."  *Henderson v. Inter-Chem Coal Co., Inc.*, 41 F.3d 567, 569 (10th Cir. 1994).

## III.  ANALYSIS

### A.  Breach of the Implied Covenant of Good Faith and Fair Dealing

The Normans claim that State Farm violated its duty of good faith and fair dealing "by, among other things, failing to offer to pay the Plaintiffs an amount which it otherwise concluded to be a fair and reasonable amount for their losses and by compelling Plaintiffs to institute litigation to recover amounts due under the Policy with State Farm."  Docket No. 47 at 5-6 (citing Colo. Rev. Stat. § 10-3-1104(h)(VII)).

10

Under Colorado law, a "special duty is imposed upon an insurer to deal in good faith with an insured." *Decker v. Browning-Ferris Indus. of Colo.*, 931 P.2d 436, 443 (Colo. 1997) (citing *Farmers Grp., Inc. v. Trimble*, 691 P.2d 1138, 1141-42 (Colo. 1984)). An insurer may breach its duty of good faith due to the insurer's conduct with third parties or with first parties. *Am. Fam. Mut. Ins. Co. v. Allen*, 102 P.3d 333, 342 (Colo. 2004). To show bad faith in a first-party claim, like this one, the insured must prove (1) that the insurer acted "unreasonably under the circumstances" and (2) that "the insurer either knowingly or recklessly disregarded the validity of the insured's claim." *Goodson v. Am. Std. Ins. Co. of Wis.*, 89 P.3d 409, 415 (Colo. 2004).

Under common law bad faith principles, Colorado courts traditionally find that it is reasonable for an insurer to challenge claims that are "fairly debatable." *Zolman v. Pinnacol Assurance*, 261 P.3d 490, 496 (Colo. App. 2011); *see also Vaccaro v. Am. Family Ins. Grp.*, 275 P.3d 750, 760 (Colo. App. 2012) (noting that the fairly debatable defense "goes as much to the knowledge or recklessness prong of common law bad faith as it does to unreasonable conduct"). Thus, under common law, finding that an insurer's justification for denying or delaying payment of a claim is "fairly debatable" typically weighs against finding that an insurer acted unreasonably. *Sanderson v. Am. Fam. Mut. Ins. Co.*, 251 P.3d 1213, 1218 (Colo. App. 2010) (citation omitted). However, "fair debatability is not a threshold inquiry that is outcome determinative as a matter of law, nor is it both the beginning and the end of the analysis in a bad faith case." *Id.*

### 1.  Unreasonable Conduct

Whether an insurer's conduct was reasonable under the circumstances is ordinarily a question of fact for the jury when conflicting evidence exists.  *Zolman v. Pinnacol Assurance*, 261 P.3d 490, 497 (Colo. App. 2011).  The reasonableness of an insurer's conduct must be determined objectively based on industry standards.  *Allen*, 102 P.3d at 342.  An insurer's claims handling decisions "must be evaluated based on the information before the insurer at the time of that decision."  *State Farm Mut. Auto. Ins. Co. v. Reyher*, 266 P.3d 383, 390 (Colo. 2011).  Although expert testimony concerning industry standards is often helpful, "[i]f the reasonable investigation and denial of an insured's claim is within the common knowledge and experience of ordinary people, then expert testimony is not required."  *Allen*, 102 P.3d at 344.  In Colorado, the Unfair Claims Settlement Practices Act ("UCSPA"), Colo. Rev. Stat. § 10-3-1104(1)(h) is designed to regulate the conduct of the insurance industry and, while it "does not establish a standard of care actionable tort, it may be used as valid, but not conclusive, evidence of industry standards . . . ."  *Allen*, 102 P.3d at 344.

The Normans appear to claim that State Farm's conduct was unreasonable in two relevant respects.  Docket No. 47 at 7-8.[7]

---

[7]The Normans' common law bad faith and statutory claims appear to be additionally premised on State Farm's failure to pay the total amount of loss as calculated by Mr. Poynor.  Docket No. 47 at 8.  State Farm's lone challenge to this aspect of the Normans' claims is its argument that the estimated damage amount contained in Mr. Poynor's expert report cannot be used to show that it acted in bad faith for failure to pay such an amount.  However, the Court has, in a separate order, excluded Mr. Poynor's report in its entirety.  Thus, State Farm's argument is moot.

### a. Denial and/or Delay

The Normans claim that State Farm "denied and/or delayed investigating and paying the full damages that were present at the inception of the claim in July 2012." Docket No. 47 at 7.[8]   State Farm argues that it reasonably evaluated the Normans' claim, timely making the first payment and, upon receipt of further information from the Normans, timely made additional inspections and payments.   Docket No. 33 at 12. State Farm argues that it was "unaware of many of the concerns of the Plaintiffs until March 2013 because of the delay on the part of the public adjuster hired by Plaintiffs in providing complete information to State Farm."   Docket No. 33 at 13.   Thus, State Farm's primary argument appears to be that any delay in making the May 2013 payment was attributable to the actions of the Normans and their public adjuster.

The Normans respond that, regardless of whether a public adjuster intervened, State Farm was obligated to conduct a reasonable inspection and prepare a fair and accurate estimate, but failed to do so.   In support of their argument, the Normans cite to Mr. Lucero's deposition testimony, which the Court construes in the light most favorable to the Normans.[9]   Mr. Lucero testified without objection that State Farm was required

---

[8]State Farm appears to argue that the Normans' claim is based entirely on State Farm's actions "after **receipt of a Proof of Loss**."   Docket No. 38 at 9.   Although the Normans are critical of State Farm's actions "after receipt of the Proof of Loss," Docket No. 36 at 17, the Normans do not appear to have limited their bad faith and statutory claims to the time period that State Farm indicates.   Docket No. 47 at 7; *see also Dale v. Guar. Nat'l Ins. Co.*, 948 P.2d 545, 551 (Colo. 1997) ("the tort of bad faith breach of an insurance contract encompasses an entire course of conduct and is cumulative").

[9]State Farm argues that some of the topics raised by defense counsel during Mr. Lucero's deposition were not properly designated in the Normans' Rule 30(b)(6) notice of deposition.   Docket No. 38 at 7 (citing Docket No. 38-3).   As a result, State Farm claims that portions of Mr. Lucero's testimony do not bind State Farm.   *Id.*   A Rule

under the policy to provide an "investigation of coverage, apply the facts to the loss of

the policy, [and] provide all available coverages under the policy." Docket No. 36-3 at

4, p. 27:13-15. Mr. Lucero also testified that "policyholders can rely on the accuracy of

State Farm estimates," *id.* at 6, p. 40:5-6, and are not required to retain a public

adjuster. *Id.* at 6, p. 39:13-15 ("It's up to the policyholder whether or not they would like

to secure the services of a public adjuster. That is their decision.").[10]

---

30(b)(6) deponent's answers to questions "outside the scope of the [deposition] notice will not bind the organization." *E.E.O.C. v. Freeman*, 288 F.R.D. 92, 99 (D. Md. 2012). However, if an examining party asks questions "outside the scope of the matters described in the notice, the general deposition rules govern [and] relevant questions may be asked and no special protection is conferred on a deponent." *King v. Pratt & Whitney*, 161 F.R.D. 475, 476 (S.D. Fla. 1995). Here, the Normans endorsed Mr. Lucero as an expert witness concerning the policy and coverage decisions at issue in this case. Docket No. 36-12. Thus, to whatever extent Mr. Lucero was asked questions not contemplated by the Normans' Rule 30(b)(6) notice, Mr. Lucero simply answered in his personal capacity or as an expert witness in the areas of the terms and conditions of the policy, State Farm's claims handling decisions, or State Farm's claims handling practices. *See id.* at 4. Regardless of whether Mr. Lucero's testimony was binding on State Farm, his testimony is relevant to the reasonableness of State Farm's conduct. For that reason, the Court need not decide whether defense counsel inquired into topics not properly designated. *See Int'l Brotherhood of Teamsters, Airline Div. v. Frontier Airlines, Inc.*, No. 11-cv-02007-MSK-KLM, 2013 WL 627149, at *6 (D. Colo. Feb. 19, 2013) (noting that seeking pre-deposition relief is preferred course for party concerned about the specificity of a Rule 30(b)(6) deposition notice).

The Court also rejects State Farm's argument that Mr. Lucero was not designated as an expert on industry standards. Although the Normans' expert disclosure does not contain the phrase "industry standards," the Normans disclosed Mr. Lucero as possessing "knowledge regarding State Farm's claims handling practices and procedures, as well as their training of adjusters and representatives in handling claims in compliance with Colorado law." Docket No. 36-12 at 4. Thus, the disclosure contemplates that Mr. Lucero may testify on claims handling practices.

[10]Defense counsel objected to the questions that elicited this testimony as being outside the scope of the Normans' Rule 30(b)(6) notice, but instructed Mr. Lucero to answer. *Id.* at 6, pp. 38:24-40:6. Thus, regardless of whether such testimony binds State Farm, Mr. Lucero appears to have answered based on his personal knowledge, or, to the extent his testimony is in the form of an expert opinion, as an expert witness.

State Farm provides no authority supporting the proposition that, whenever an insured retains a public adjuster, an insurer is relieved from conducting a reasonable investigation, and the Court finds no basis for so concluding. *See* Colo. Rev. Stat. § 10-3-1104(1)(h)(IV) (stating that unfair claims settlement practice is willfully "[r]efusing to pay claims without conducting a reasonable investigation based upon all available information"). Moreover, the Court rejects any argument that an insured must retain its own adjuster in order to secure the complete payment of a claim. Because an insured is not required to retain its own adjuster, a reasonable juror could also conclude that it is unreasonable for an insurer to compel an insured to hire an adjuster to recover amounts due under a policy by offering less than what is ultimately recovered. *See* § 10-3-1104(1)(h)(VII) (stating that compelling an insured to initiate litigation to recover amounts due is unfair claims settlement practice). Thus, regardless of whether the Normans retained their own adjuster, State Farm was required to conduct a reasonable investigation.

The question becomes whether the Normans have presented evidence that State Farm failed to conduct a reasonable investigation. Mr. Lucero testified that, during the initial handling of the Normans' claim in July 2012, State Farm believed it had identified the damage to the Normans' home and that there was no reason for needing an additional expert inspection. Docket No. 36-3 at 10, p. 84:8-17; *see also id.* at 11, p. 86:4-7 ("The settlement payment that we made in July of 2012 would have been the settlement had we not received additional information that caused us to make additional payments."). Mr. Lucero testified that the Normans' claim was reevaluated because of information received from the public adjuster and that, upon receipt of such information,

15

"[State Farm] hired an expert to go out there and inspect the property again and provide us with information that helped us adjust this claim and make additional payments to Mr. and Ms. Norman." *Id.* at 10, p. 83:3-14. Thus, State Farm appears to admit that the May 2013 payment was based upon additional inspections conducted by State Farm in April 2013. However, State Farm fails to establish, as a matter of law, that the additional inspections should not or could not have been conducted earlier in the claims handling process. Mr. Lucero admitted, without objection, that the condition of the Normans' home in May 2013 was virtually the same as it was in July 2012. *Id.* at 8 p. 76:20-23.[11] A reasonable juror could therefore conclude that, because the Normans' home was in substantially the same condition in July 2012 as it was in April 2013, engineering and industrial hygienist inspections conducted earlier in the claims handling process would have revealed the same information upon which State Farm based its May 2013 payment, which in turn could have led to an earlier payment of the additional $85,574.43. Thus, a factfinder could conclude that State Farm failed to conduct a prompt, reasonable investigation of the underlying damage to the Normans' home, *see*

---

[11]Mr. Lucero also testified as follows:
Q: When you made the fair payment, according to State Farm, in April 2013, the information you had was what was revealed in the inspection of a house plus experts that you yourself hired, correct? That's what the payment was based on, correct?
A: The payment is based on that, yes.
Q: All of that, that data, all of that was available or could have been available to State Farm in July of 2012, correct?
. . . A: It could have been available; however, . . . we didn't have any information to say that our initial inspection and findings were not accurate.
*See also id.* at 9-10, pp. 81:14-82:2. Although State Farm's counsel objected to the second question, the basis of his objection is not clear from the transcript and the objection is not re-raised by State Farm.

*Allen*, 102 P.3d at 345, resulting in the delay and/or denial of a portion of the Normans' claim.

State Farm argues that its conduct is justified by the Normans' failure to timely provide to State Farm documents it requested or a scope of repairs. According to Mr. Lucero, the policyholder is required under the policy to "cooperate and provide information as requested." Docket No. 36-3 at 4, pp. 27:25-28:6.[12] However, Mr. Lucero was asked whether, in his opinion as someone "with experience who has reviewed the file," the Normans performed their duties under the policy and answered, "Based on my review of the Normans' claim file, I don't believe they did anything wrong." *Id.* at 4, pp.28:19-29:8. Thus, at a minimum, there is a genuine dispute as to whether the Normans cooperated as requested. In addition, Mr. Lucero testified that an insured was permitted to rely on the accuracy of State Farm's estimates, which suggests that an insurer's duty to conduct a reasonable investigation is not dependent on whether the insured requests more money in satisfaction of a claim. Although State Farm argues that it was unaware of the Normans' specific requests until March 2013, the Normans informed State Farm of electrical issues and difficulty in cleaning the carpet after the July/August 2012 payment, which arguably could have indicated to State Farm that the July/August 2012 payment was insufficient to satisfy the Normans' claim. State Farm fails to establish that the Normans' actions rendered its own conduct

_____

[12]State Farm objected to the question that elicited this testimony as outside the scope of plaintiff's Rule 30(b)(6) deposition notice, but was not prohibited from answering the question. *Id.* As noted above, to whatever extent Mr. Lucero's testimony does not bind State Farm, Mr. Lucero testified as either a fact witness or as an expert witness.

reasonable as a matter of law.[13]

Although State Farm argues that other aspects of its conduct were reasonable, sufficient evidence exists to create a genuine dispute of material fact as to the reasonableness of State Farm's conduct in denying and/or delaying investigating and paying the Normans' claim.

### b.  SJR Invoice

The next aspect of the Normans' common law bad faith claim is State Farm's refusal to pay SJR's invoice for its inspection and testing of the Normans' home. Docket No. 47 at 8.  Neither party indicates whether the policy requires State Farm to pay SJR.  Mr. Lucero testified that, because State Farm did not request SJR to prepare a report on the Normans' home, State Farm did not pay SJR's fees.  Docket No. 36-3 at 13, p. 97:7-10.  However, as discussed above, there is evidence that, but for information provided by the public adjuster, including SJR's report, State Farm would not have conducted the additional investigation that led to the payment of an additional $85,574.43.  *See id.* at 13, 96:8-20.  Thus, a reasonable juror could conclude that State Farm's failure to conduct a reasonable investigation caused the Normans to incur the expense of retaining SJR and, as a result, that State Farm's decision not to pay the SJR invoice was made in bad faith.

### 2.  *Knowing or Reckless Disregard*

The Court turns to the question of whether State Farm knowingly or recklessly

---

[13]Similarly, the fact that the Normans no longer appear to seek all of the damages claimed in the proof of loss does not, as State Farm argues, render the totality of the Normans' claim fairly debatable or otherwise relieve State Farm of liability for its claims-handling decisions.  *See Sanderson*, 251 P.3d at 1218.

disregarded the validity of the Normans' claim.  State Farm claims that it was not aware of precisely what the Normans were requesting until the public adjuster provided it with a completed scope of repairs in March 2013.  Docket No. 33 at 13.  However, sufficient evidence exists for a reasonable juror to find that State Farm was aware of or recklessly disregarded the possibility that the Normans' claim was not entirely satisfied by the July/August 2012 payment.  On July 5, 2012, Mrs. Norman reported heavy smoke damage to the interior and exterior of the house.  Docket No. 33-3 at 20.  On July 10, 2012, Irvin Bergeron with State Farm reported a slight smoke smell in the house and light smoke damage throughout the home.  *Id.*  Mr. Bergeron found slight soot on his socks after inspecting the Normans' home.  *Id.* at 19.  On August 29, 2012, Mrs. Norman expressed to State Farm that she was having difficulty cleaning the carpet.  *Id.* at 15-16.  On September 28, 2012, Mrs. Norman indicated to State Farm that the Normans' home continued to have electrical issues.  *Id.* at 15.  As early as December 17, 2012, State Farm knew that SJR also recommended ventilating the interior of the home, removing attic insulation and cleaning structural components, decontamination of walls, ceiling, and floors throughout the home, cleaning of the HVAC system, cleaning, decontamination, or disposal of personal items, and further testing.  Docket No. 36 at 9, ¶ 24; *see also* Docket No. 36-7 at 11-12.  The Court finds that a genuine dispute of material fact exists concerning whether State Farm knew or recklessly disregarded the possibility that State Farm's July/August 2012 payment did not fully compensate the Normans for their fire-related losses.

For the foregoing reasons, State Farm's motion for summary judgment on the Normans' common law bad faith claim is denied.

### B.  Violation of Colo. Rev. Stat. § 10-3-1115 and § 10-3-1116

Under § 10-3-1115, an insurer may not "unreasonably delay or deny payment of a claim for benefits owed to or on behalf of any first-party claimant."[14]  Colo. Rev. Stat. § 10-3-1115(1)(a).  Similarly, § 10-3-1116 states that "[a] first-party claimant as defined in section 10-3-1115 whose claim for payment of benefits has been unreasonably delayed or denied may bring an action in a district court to recover reasonable attorney fees and court costs and two times the covered benefit."  Colo. Rev. Stat. § 10-3-1116(1).  An insurer's delay is unreasonable "if the insurer delayed or denied authorizing payment of a covered benefit *without a reasonable basis* for that action."  Colo. Rev. Stat. § 10-3-1115(2) (emphasis added).

Because the statutes at issue here create a cause of action that is different from the common law tort of bad faith breach of an insurance contract, the "burden of proving th[e] statutory claim is less onerous than that required to prove a claim under the common law for breach of the duty of good faith and fair dealing."  *Kisselman v. Am. Fam. Mut. Ins. Co.*, 292 P.3d 964, 975 (Colo. App. 2011); *see also Vaccaro*, 275 P.3d at 760 ("Even if plaintiff's claim for . . . benefits were 'fairly debatable' in the common law context, that would not alone establish that defendant's actions here were reasonable as a matter of law.").  However, even under the statutes, the reasonableness of an insurer's conduct must be determined objectively, based on proof of industry standards.  *See Allen*, 102 P.3d at 342.

The Normans' statutory claim appears to be based on the same aspects of State

---

[14]The parties do not dispute that the Normans are first-party claimants within the meaning of the statutes.  *See* Colo. Rev. Stat. § 10-3-1115.

Farm's conduct identified above. *See* Docket No. 47 at 7-8. The Court finds that the Normans have satisfied their burden of creating a genuine dispute of material fact under this less onerous statutory standard. *See Kisselman*, 292 P.3d at 975. For the reasons discussed above, the Court finds that a genuine dispute of material fact exists with respect to the reasonableness of State Farm's conduct in denying and/or delaying investigating and paying damages. A reasonable juror could find that State Farm delayed and/or denied payment of the covered benefit for failure to conduct a reasonable investigation of the damages to the Normans' home. *See Allen*, 102 P.3d at 345. A reasonable juror could also find that State Farm's refusal to pay SJR's invoice was unreasonable under the circumstances. State Farm's arguments with respect to these aspects of the Normans' statutory claim are largely the same as those discussed above and are rejected for the same reasons.

State Farm's only additional argument with respect to the Normans' statutory claim is that the Normans did not "identify any witness or expert to testify to the conduct that is unreasonable or in violation of an industry standard." Docket No. 33 at 15. State Farm later admits that, although expert testimony may not always be necessary in determining the reasonableness of an insurer's conduct, "it appears that an expert may be necessary to address the insurance industry standards in this matter." Docket No. 38 at 9. The Court disagrees. State Farm's alleged failure to reasonably investigate the full extent of the damage to the Normans' home is within the common understanding of a ordinary juror. *Cf. Allen*, 102 P.3d at 345 (holding that the "reasonableness of an insurer's investigation into the underlying events of an automobile insurance claim" and "determination of what constitutes a reasonable

21

explanation for denying a claim" were within the knowledge of the average juror).

Moreover, the UCSPA, which is valid, but not conclusive evidence of industry

standards, provides relevant guidance concerning the industry standards applicable to

this dispute.  *See* § 10-3-1104(1)(h).  As noted above, although the Normans' expert

disclosure concerning Mr. Lucero does not contain the phrase "industry standards," the

topics on which Mr. Lucero has been endorsed are arguably relevant to the

reasonableness of State Farm's claims handling conduct.  *See* Docket No. 36-12 at 4.

State Farm has therefore failed to establish that the Normans' statutory claim should be

dismissed for failure to provide expert testimony on industry standards.

State Farm's motion for summary judgment on the Normans' statutory claim is

denied.

## IV.  CONCLUSION

For the foregoing reasons, it is

**ORDERED** that State Farm's Motion for Partial Summary Judgment [Docket No.

33] is **DENIED**.


DATED November 19, 2014.

BY THE COURT:


 s/Philip A. Brimmer                          
PHILIP A. BRIMMER
United States District Judge
